**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| LISA ZAMPINE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| AMERICAN MEDICAL SYSTEMS, INC.; | ) | |
| AMERICAN MEDICAL SYSTEMS, LLC, | ) | |
| individually and f/k/a | ) | |
| AMERICAN MEDICAL SYSTEMS, INC.; | ) | |
| AMERICAN MEDICAL SYSTEMS | ) | |
| HODLINGS, INC.; ASTORA | ) | |
| WOMEN'S HEALTH, INC.; ASTORA | ) | |
| WOMEN'S HEALTH LLC; ASTORA | ) | |
| WOMEN'S HEALTH HOLDINGS, LLC; | ) | |
| ASTORA HOLDINGS, LLC; ENDO | ) | |
| PHARMACEUTICALS, INC.; ENDO | ) | |
| PHARMACEUTICALS HOLDINGS, INC.; | ) | |
| ENDO HEALTH SOLUTIONS, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOW Plaintiff Lisa Zampine and files her Original Complaint, complaining of Defendants American Medical Systems, Inc., American Medical Systems, LLC individually and f/k/a American Medical Systems, Inc., American Medical Systems Holdings, Inc., Astora Women's Health, Inc., Astora Women's Health LLC, Astora Women's Health Holdings LLC, Astora Holdings, LLC, Endo Pharmaceuticals, Inc., Endo Pharmaceuticals Holdings Inc., Endo Health Solutions, Inc. and in support respectfully shows the Court as follows:

### PARTIES AND SERVICE

1.      Plaintiff Lisa Zampine is an individual and resident of Stoughton, Norfolk County, Massachusetts.

2.      Defendant American Medical Systems, Inc. ("AMS") is a wholly owned subsidiary of defendant American Medical Systems Holdings Inc., Defendant AMS is a wholly owned subsidiary of defendant Endo Pharmaceuticals, Inc., Endo Pharmaceuticals Holdings Inc. and Endo Health Solutions Inc. and is a foreign corporation with its principal office in Minnesota.  AMS may be served through its registered agent, CT Corporation System, 101 Federal Street, Boston, MA  02110.

3.      Defendant American Medical Systems, LLC, ("AMS LLC") is a foreign corporation with its principal office in Delaware.  AMS LLC is not registered with the Massachusetts Secretary of State.

4.      Defendant American Medical Systems Holdings Inc., ("AMS HOLDINGS") is a foreign corporation with its principal office in Minnesota.  AMS HOLDINGS is not registered with the Massachusetts Secretary of State.

5.      Defendant Astora Women's Health, Inc., ("ASTORA") was a foreign corporation with its principal office in Minnesota.  ASTORA is not registered with the Massachusetts Secretary of State.

6.      Defendant Astora Women's Health LLC, ("ASTORA LLC") is a foreign corporation with its principal office in Minnesota.  ASTORA LLC may be served through its registered agent CT Corporation System, 155 Federal Street, Suite 700, Boston, MA  02110.

7.      Defendant Astora Women's Health Holdings, LLC, ("ASTORA HOLDINGS") is a foreign corporation registered in Delaware.  ASTORA HOLDINGS is not registered with the Massachusetts Secretary of State.

8.      Defendant Astora Holdings, LLC, ("ASTORA HOLDINGS LLC") is a foreign corporation registered in Delaware.  ASTORA HOLDINGS LLC is not registered with the Massachusetts Secretary of State.

9.      Defendant Endo Pharmaceuticals, Inc. (ENDO) is a Pennsylvania corporation, with its principal place of business at 100 Endo Boulevard, Chadds Ford, Pennsylvania. 19317.  ENDO may be served through its registered agent CT Corporation System, 155 Federal Street, Suite 700, Boston, MA  02110.

10.     Defendant Endo Pharmaceuticals Holdings, Inc. (ENDO HOLDINGS) was a Delaware corporation with its principal place of business at 100 Endo Boulevard, Chadds Ford, Pennsylvania 19317. ENDO HOLDINGS was the parent of wholly-owned subsidiary, ENDO.  On May 23, 2012, ENDO HOLDINGS changed its name to Endo Health Solutions, Inc.

11.     Defendant Endo Health Solutions Inc. (ENDO HEALTH SOLUTIONS) is a Delaware corporation with its principal place of business at 100 Endo Boulevard, Chadds Ford, Pennsylvania 19317 and is the parent of AMS and AMS HOLDINGS.  ENDO HEALTH SOLUTIONS is not registered with the Massachusetts Secretary of State.

12.     Defendant ENDO HEALTH SOLUTIONS has aggregated four operating businesses into one enterprise including AMS and AMS HOLDINGS.

13.     At all relevant times, defendant ENDO merged with AMS and as part of that acquisition, purchased and assumed all liability relating to legal claims arising from the implantation of defective synthetic pelvic mesh systems. ENDO and AMS shall be referred to hereinafter collectively as "Defendants."

14.     At all times material to this action, Defendants have designed, patented, manufactured, labeled, marketed, and sold and distributed a line of pelvic mesh products. These products were designed primarily for the purposes of treating stress urinary incontinence and pelvic organ prolapse. These products share common design elements and common defects. Moreover, each of these products was cleared for sale in the U.S. after the Defendants made assertions to the Food and Drug Administration of "Substantial Equivalence" under Section 510(k) of the Food, Drug and Cosmetic Act; this clearance process does not require the applicant to prove safety or efficacy.

**VENUE**

15.     Defendants have significant contacts in Massachusetts such that they are subject to personal jurisdiction. On information and belief, Defendants are and at all relevant times were engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying,

selling, marketing, and/or introducing in interstate commerce, either directly or indirectly through third parties or related entities, its products including the pelvic mesh products implanted into Plaintiff. At all relevant times, Defendants conducted regular and sustained business in Massachusetts by marketing, selling, and distributing their pelvic mesh products, including the product implanted in Plaintiff. Upon information and belief, at all times relevant, Defendants transacted, solicited, and conducted business in the State of Massachusetts and derived substantial revenue from such business. At all relevant times, Defendants expected or should have expected that their acts would have consequences within the United States of America, including the State of Massachusetts.

16.     Plaintiff is seeking damages in excess of $75,000. Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1332.

17.     Claims arising from the same operative facts described herein against other transvaginal mesh manufacturers are currently pending in MDL No. 2325 in the United States District Court for the Southern District of West Virginia, In Re: American Medical Systems, Inc., Pelvic Repair System Products Liability Litigation.

## FACTUAL BACKGROUND

## TRANSVAGINAL MESH PRODUCTS SOLD BY DEFENDANTS

18.     At all times relevant herein, Defendants were engaged in the business of placing medical devices into the stream of commerce by designing, manufacturing, marketing, packaging, labeling, and selling such devices, including the Sparc Sling System ("Sparc").  The Sparc is represented by Defendants to correct and restore normal pelvic function by implantation of polypropylene mesh in the pelvis tethered in place by two arms that extend up through a woman's pelvis. They are specifically promoted to physicians and patients as an innovative, minimally invasive procedure with minimal local tissue reactions, minimal tissue trauma, and minimal pain while correcting urinary incontinence.

19.     Prior the implantation of the Sparc at issue in this claim, Defendants sought and obtained Food and Drug Administration ("FDA") clearance to market the Sparc under Section 510(k) of the Medical

Device Amendment to the Food, Drug and Cosmetics Act. Section 510(k) allows marketing of medical devices if the device is deemed substantially equivalent to other legally marketed predicate devices marketed prior to May 28, 1976. No formal review for safety or efficacy is required.

20.     Despite claims that the monofilament polypropylene mesh in the Sparc is inert, the scientific evidence shows that this material is biologically incompatible with human tissue and promotes an immune response. This immune response promotes degradation of the mesh material and can contribute to the formation of severe adverse reactions to the mesh.

21.     The Sparc has been and continues to be marketed to the medical community and to patients as safe, effective, and reliable medical devices that can be implanted by safe, effective, and minimally invasive surgical techniques.

22.     Defendants marketed and sold the Sparc through carefully planned, multifaceted marketing campaigns and strategies. These campaigns and strategies include, but are not limited to, aggressive marketing and the provision of valuable cash and non-cash benefits to healthcare providers. Defendants also utilized documents, patient brochures, and websites, offering exaggerated and misleading expectations as to the safety, utility, and efficacy of the Sparc and its other transvaginal mesh products.

23.     Contrary to the representations and marketing of Defendants, the Sparc has high failure, injury, and complication rates, fails to perform as intended, requires frequent and often debilitating revision surgeries, and has caused severe and irreversible injuries, conditions, and damage to a significant number of women, including Plaintiff Zampine. The defects stem from many issues, including:

    a.     the use of polypropylene material in the Sparc and the immune reaction that results;

    b.     the design of the Sparc to be inserted transvaginally into an area of the body with high levels of pathogens that adhere to the mesh, which can cause immune reactions and subsequent tissue breakdown;

    c.     the contraction and/or shrinkage of the mesh and surrounding scar tissue;

d.      biomechanical issues with the design of the mesh that create strong amounts of friction between the mesh and the underlying tissue that subsequently cause that tissue to degrade and the device to migrate into organs and surrounding structures;

e.      the use and design of anchors in the Sparc that when placed correctly are likely to pass through and injure major nerve routes in the pelvic region;

f.      degradation of the mesh itself over time which causes the internal tissue to degrade;

g.      the welding of the mesh itself during production, which creates a toxic substance that contributes to the degradation of the mesh and host tissue; and

h.      the design of the trocars (devices used to insert the Sparc into the vagina) requires tissue penetration in nerve-rich environments, which results frequently in the destruction of nerve endings.

24.     Upon information and belief, Defendants has consistently underreported and withheld information about the propensity of its Sparc to fail and to cause injury and complications and has misrepresented the efficacy and safety of its transvaginal mesh products, including the Sparc, through various means and media, actively and intentionally misleading the public.

25.     Despite the chronic underreporting of adverse events associated with the Sparc, enough complaints were recorded for the Food and Drug Administration ("FDA") to issue a public health notification regarding the dangers of these devices.

26.     On October 20, 2008, the FDA issued a Public Health Notification that described over a thousand (1,000) complaints (otherwise known as "adverse events") that had been reported over a three-year period relating to the Sparc and other similar products. Although the FDA notice did not identify the transvaginal mesh manufacturers by name, a review of the FDA's MAUDE database indicates that Defendants is one of the manufacturers of the products that are the subject of the notification.

27.     On July 13, 2011, the FDA issued a Safety Communication entitled, "UPDATE on Serious Complications Associated with Transvaginal Placement of Surgical Mesh for Pelvic Organ Prolapse." Therein, the FDA advised that it had conducted an updated analysis of adverse events reported to the FDA and complications reported in the scientific literature and concluded that surgical mesh used in transvaginal repair of pelvic organ prolapse was an area of "**continuing serious concern**." (emphasis added) The FDA concluded that serious complications associated with surgical mesh for transvaginal repair of pelvic organ prolapse were "not rare." These serious complications include, but are not limited to, neuromuscular problems, vaginal scarring/shrinkage, and emotional problems. Many of the serious complications required medical and surgical treatment and hospitalization. The FDA concluded that it was not clear that transvaginal repair of pelvic organ prolapse and stress urinary incontinence with mesh kits was more effective than traditional non-mesh repair of these conditions. The FDA conducted a systematic review of the published scientific literature from 1996 to 2011 and concluded that transvaginal pelvic organ prolapse repair with mesh "does not improve symptomatic results or quality of life over traditional non mesh repair." In the July 13, 2011 Safety Communication, the FDA concluded that "a mesh procedure may put the patient at risk for requiring additional surgery or for the development new complications. Removal of the mesh due to mesh complications may involve multiple surgeries and significantly impair the patient's quality of life. Complete removal of mesh may not be possible." The information contained in the FDA's Public Health Notification of October 2008 and the FDA Safety Communication of July 13, 2011 was known or knowable to Defendants and was not disclosed in any manner.

28.     Defendants have further known the following:

     a.     that some of the predicate devices for the Sparc had high failure and complication rates, resulting in the recall of some of these predicate devices;

     b.     that there were and are significant differences between the Sparc and some or all of the predicate devices, rendering them unsuitable for designation as predicate devices;

    c.      that these significant differences render the disclosures to the FDA incomplete and misleading; and

    d.      that its transvaginal mesh products, including thee Sparc, were and are causing numerous patients severe injuries and complications.

29.     Defendants suppressed this information and failed to accurately and completely disseminate or share this and other critical information with others, including Plaintiff Zampine. As a result, Defendants actively and intentionally misled and continues to mislead the public into believing that its transvaginal mesh products, including the Sparc, and the procedures for implantation were and are safe and effective.

30.     Defendants failed to perform or rely on proper and adequate testing and research in order to determine and evaluate the risks and benefits of the Sparc.

31.     Defendants failed to design and establish a safe, effective procedure for removal of the Sparc; thus, in the event of a failure, injury, or complications, it is impossible to easily and safely remove the Sparc or parts thereof.

32.     Feasible and suitable alternative designs as well as suitable alternative procedures and instruments for repair of pelvic organ prolapse and stress urinary incontinence have existed at all times relevant to this matter.

33.     The Sparc was at all times utilized and implanted in a manner foreseeable to Defendants, as they generated the instructions for use, created the procedures for implanting the devices, and trained the implanting physicians.

34.     Defendants provided incomplete, insufficient, and misleading training and information to physicians to increase the number of physicians utilizing the Sparc, and thus increase the sales of these products.

35.     The Sparc implanted into Plaintiff Zampine was in the same or substantially similar condition as when it left the possession of Defendants, as well as being in the condition directed by and expected by this Defendant.

36.     Plaintiff Zampine and her physicians foreseeably used and implanted the Sparc, and did not misuse or alter these products in an unforeseeable manner.

37.     The injuries, conditions, and complications suffered by women who have been implanted with the Sparc include, but are not limited to, mesh erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation, dyspareunia (pain during sexual intercourse), blood loss, acute and chronic nerve damage and pain, pudendal nerve damage, pelvic floor damage, chronic pelvic pain, urinary and fecal incontinence, recurrent and chronic infections, and prolapse of organs. In many cases, these women have been forced to undergo intensive medical treatment, including, but not limited to, the use of pain control and other medications, injections into various areas of the pelvis, spine, and the vagina, and surgeries to remove portions of the female genitalia, to locate and remove mesh, and to attempt to repair pelvic organs, tissue, and nerve damage.

38.     The medical and scientific literature studying the effects of polypropylene pelvic mesh (like the material used in the Sparc) have examined each of these injuries, conditions, and complications and determined that they are in fact casually related to the mesh itself and do not often implicate errors related to the implantation of the devices.

39.     Defendants knew and had reason to know that the Sparc could and would cause severe and grievous personal injury to the users/recipients of the Sparc, and that they were inherently dangerous in a manner that exceeded any purported, inaccurate, or otherwise downplayed warnings.

40.     At all relevant times herein, Defendants continued to promote Sparc as safe and effective even when no clinical trials had been done supporting long or short term efficacy.

41.     At all relevant times herein, Defendants failed to provide sufficient warnings and instructions that would have put Plaintiff Zampine and the public on notice of the dangers and adverse effects caused by implantation of the Sparc.

42.     The Sparc was defective as marketed due to inadequate warnings, instructions, labeling, and/or inadequate testing.

### Medical Care at Issue

43.     On June 1, 2016, Plaintiff Zampine underwent surgery during which she was implanted with the Sparc at St. Elizabeth's Hospital to treat her urinary incontinence, the use for which Defendants marketed and sold these products.

44.     As a result of the implantation of the Sparc, on or about May 22, 2019, Plaintiff Zampine underwent surgery to remove the Sparc mesh at Tufts Medical Center in Boston, Massachusetts.

45.     As a result of the implantation of the Sparc, Plaintiff Zampine suffered and will continue to suffer serious bodily injuries, including pain, discomfort, hospitalization, additional surgery(ies), continued incontinence, and the erosion of the Sparc into her surrounding organs and tissues.

### CAUSES OF ACTION

### COUNT I

### Negligence

46.     Plaintiff realleges and incorporates by reference every allegation of this Complaint as if each were set forth fully and completely herein.

47.     Defendants had a duty to exercise reasonable and ordinary care in the manufacture, design, labeling, instructions, warnings, sale, marketing, and distribution of their pelvic mesh products, and recruitment and training of physicians to implant their pelvic mesh products.

48.     Defendants had a duty of care under Massachusetts law to undertake reasonable measures to market a safe product. This duty also included knowing the potential risks of their pelvic mesh products when marketed for foreseeable uses.

49.     Defendants breached their duty of care to the Plaintiff; as aforesaid, in the manufacture, design, labeling, warnings, instructions, sale, marketing, distribution, and recruitment and training of physicians to implant their pelvic mesh products.

50.     Defendants' actions, when viewed objectively from Defendants' standpoint at the time of the occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and Defendants had an actual, subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.

51.     As a proximate result of Defendants' design, manufacture, labeling, marketing, sale, and distribution of their pelvic mesh products, Plaintiff has been injured, catastrophically, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

52.     WHEREFORE, Plaintiff demands judgment against Defendants, and requests compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT II

### Products Liability - Design Defect

53.     Plaintiff realleges and incorporates by reference every allegation of this Complaint as if each were set forth fully and completely herein.

54.     At the time of Plaintiff's injuries, Defendants' pelvic mesh products were in a defective condition because, at the time they were conveyed by Defendants to another party, their products were in a condition that rendered them unreasonably dangerous as designed, taking into consideration the utility of the products and the risk involved in their use, and for which there was a safer alternative design that would have prevented or significantly reduced the risk of the injury in question without substantially impairing the products' utility and was economically and technologically feasible at the

time the products left the control of Defendants by the application of existing or reasonably achievable scientific knowledge.

55.     Defendants' actions, when viewed objectively from Defendants' standpoint at the time of the occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and Defendants had an actual, subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.

56.     As a proximate result of Defendants' design, manufacture, marketing, sale, and distribution of their pelvic mesh products, Plaintiff has been injured, catastrophically, and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

57.     WHEREFORE, Plaintiff demands judgment against Defendants, and requests compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT III

### Products Liability - Failure to Warn

58.     Plaintiff realleges and incorporates by reference every allegation of this Complaint as if each were set forth fully and completely herein.

59.     Under Massachusetts law, a product is defective if the manufacturer fails to give effective warnings of the product's dangers that were known or should have been known, or fails to give adequate instructions to avoid such dangers, which failure rendered the product unreasonably dangerous as marketed, meaning that the product was dangerous to an extent beyond that which would be contemplated by the ordinary user of the product with the ordinary knowledge common to the community as to the product's characteristics.

60.     Defendants failed to properly and adequately warn and instruct the Plaintiff and her health care providers as to the proper candidates for use of Defendants' pelvic mesh products, and the safest and

most effective methods of implantation and use of Defendants' pelvic mesh products. Defendants failed to properly package or label their products to give reasonable warnings of danger about the product to Plaintiff and her health care providers.

61.     Defendants failed to properly and adequately warn and instruct the Plaintiff and her health care providers as to the dangers of Defendants' pelvic mesh products, given the Plaintiff's conditions and need for information.

62.     Defendants failed to properly and adequately warn and instruct the Plaintiff and her health care providers with regard to the inadequate research and testing of their pelvic mesh products, and the complete lack of a safe, effective procedure for removal of their pelvic mesh products.

63.     Defendants' actions, when viewed objectively from Defendants' standpoint at the time of the occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and Defendants had an actual, subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.

64.     As a proximate result of Defendants' design, manufacture, marketing, sale, and distribution of their pelvic mesh products, Plaintiff has been injured, catastrophically, and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

65.     Defendants are strictly liable in tort to the Plaintiff for their wrongful conduct.

66.     WHEREFORE, Plaintiff demands judgment against Defendants of compensatory damages, punitive damages, interest, attorneys' fees, costs of suit, and such further relief as the Court deems equitable and just.

## COUNT IV

### Breach of Express Warranty

67.     Plaintiff realleges and incorporates by reference every allegation of this Complaint as if each were set forth fully and completely herein.

68.     At all relevant and material times, Defendants manufactured, distributed, advertised, promoted, and sold pelvic mesh products.

69.     At all relevant times, Defendants intended that their pelvic mesh products be used in the manner that Plaintiff in fact used them and Defendants expressly warranted that each product was safe and fit for use by consumers, that they were of merchantable quality, that their side effects were minimal and comparable to other pelvic mesh products, and that they were adequately tested and fit for their intended use.

70.     At all relevant times, Defendants were aware that consumers, including Plaintiff, would use their pelvic mesh products; which is to say that Plaintiff was a foreseeable user of Defendants' pelvic mesh products.

71.     Plaintiff and/or her implanting physicians were at all relevant times in privity with Defendants.

72.     Defendants' pelvic mesh products were expected to reach and did in fact reach consumers, including Plaintiff and her implanting physicians, without substantial change in the condition in which they were manufactured and sold by Defendants.

73.     Defendants breached various express warranties with respect to their pelvic mesh products including the following particulars:

    a.   Defendants represented to Plaintiff and her physicians and healthcare providers through their labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory submissions that their pelvic mesh products were safe and fraudulently withheld and concealed information about the substantial risks of serious injury associated with using the pelvic mesh products;

    b.   Defendants represented to Plaintiff and her physicians and healthcare providers that their pelvic mesh products were as safe, and/or safer than other alternative procedures and devices and fraudulently concealed information, which demonstrated that the products were not safer than alternatives available on the market; and

       c.   Defendants represented to Plaintiff and her physicians and healthcare providers that their pelvic mesh products were more efficacious than other alternative medications and fraudulently concealed information, regarding the true efficacy of the products.

74.    In reliance upon Defendants' express warranty, Plaintiff was implanted with the Defendants' pelvic mesh products as prescribed and directed, and therefore, in the foreseeable manner normally intended, recommended, promoted, and marketed by Defendants.

75.    At the time of making such express warranties, Defendants knew or should have known that the their pelvic mesh products did not conform to these express representations because their pelvic mesh products were not safe and had numerous serious side effects, many of which Defendants did not accurately warn about, thus making their pelvic mesh products unreasonably unsafe for their intended purpose.

76.    Members of the medical community, including physicians and other healthcare professionals, as well as Plaintiff and the Public relied upon the representations and warranties of Defendants in connection with the use recommendation, description, and/or dispensing of their pelvic mesh products.

77.    Defendants breached their express warranties to Plaintiff in that Defendants' pelvic mesh products were not of merchantable quality, safe and fit for their intended uses, nor were they adequately tested.

78.    Defendants' actions, when viewed objectively from Defendants' standpoint at the time of the occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and Defendants had an actual, subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.

79.    As a proximate result of the Defendants' conduct, Plaintiff has been injured, catastrophically, and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

80.     WHEREFORE, Plaintiff demands judgment against Defendants, and requests compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT V

### Breach of Implied Warranty

81.     Plaintiff realleges and incorporates by reference every allegation of this Complaint as if each were set forth fully and completely herein.

82.     At all relevant and material times, Defendants manufactured, distributed, advertised, promoted, and sold pelvic mesh products.

83.     At all relevant times, Defendants intended that their pelvic mesh products be implanted for the purposes and in the manner that Plaintiff or Plaintiff's implanting physicians in fact used them and Defendants impliedly warranted each product to be of merchantable quality, safe and fit for such use, and were not adequately tested.

84.     Defendants were aware that consumers, including Plaintiff or Plaintiff's physicians, would implant their pelvic mesh products in the manner directed by the instructions for use; which is to say that Plaintiff was a foreseeable user of the pelvic mesh products.

85.     Plaintiff and/or her physicians were at all relevant times in privity with Defendants.

86.     Defendants' pelvic mesh products were expected to reach and did in fact reach consumers, including Plaintiff or Plaintiff's physicians, without substantial change in the condition in which they were manufactured and sold by Defendants.

87.     Defendants breached various implied warranties with respect to the Defendants' pelvic mesh products, including the following particulars:

        a.   Defendants represented through their labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory submissions that their pelvic mesh products were safe and fraudulently withheld and concealed

information about the substantial risks of serious injury associated with using the pelvic mesh products;

b.   Defendants represented that their pelvic mesh products were safe, and/or safer than other alternative devices or procedures and fraudulently concealed information, which demonstrated that Defendants' pelvic mesh products were not as safe or safer than alternatives available on the market; and

c.   Defendants represented that their pelvic mesh products were more efficacious than alternative pelvic mesh products and procedures and fraudulently concealed information, regarding the true efficacy of the pelvic mesh products.

88.   In reliance upon Defendants' implied warranty, Plaintiff used their pelvic mesh products as prescribed and in the foreseeable manner normally intended, recommended, promoted, and marketed by Defendants.

89.   Defendants breached their implied warranty to Plaintiff in that their pelvic mesh products were not of merchantable quality, safe and fit for their intended use, or adequately tested.

90.   Defendants' actions, when viewed objectively from Defendants' standpoint at the time of the occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and Defendants had an actual, subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.

91.   As a proximate result of the Defendants' conduct, Plaintiff has been injured, catastrophically, and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

92.   WHEREFORE, Plaintiff demands judgment against Defendants, and requests compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

COUNT VI

Gross Negligence

93.     Plaintiff realleges and incorporates by reference every allegation of this Complaint as if each were set forth fully and completely herein.

94.     Defendants' actions as described above, when viewed objectively from Defendants' standpoint at the time of the occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and Defendants had an actual, subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.

95.     Plaintiff therefore will seek to assert claims for exemplary damages at the appropriate time under governing law in an amount that would punish Defendants for their conduct and which would deter other manufacturers from engaging in such misconduct in the future.

96.     WHEREFORE, Plaintiff demands judgment against Defendants, and requests compensatory damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

COUNT VII

Punitive Damages

97.     Plaintiff realleges and incorporates by reference every allegation of this Complaint as if each were set forth fully and completely herein.

98.     At all times relevant hereto, Defendants knew or should have known that their pelvic mesh products were inherently more dangerous with respect to the risks of erosion, failure, pain and suffering, loss of life's enjoyment, remedial surgeries and treatments in an effort to cure the conditions proximately related to the use of the product, as well as other severe and personal injuries which are permanent and lasting in nature.

99.     At all times material hereto, Defendants attempted to misrepresent and did misrepresent facts concerning the safety of their pelvic mesh products.

100.    Defendants' misrepresentation included knowingly withholding material information from the medical community and the public, including Plaintiff, concerning the safety and efficacy of their pelvic mesh products.

101.    At all times material hereto, Defendants knew and recklessly disregarded the fact that their pelvic mesh products cause debilitating and potentially lethal side effects with greater frequency than safer alternative methods products and/or procedures and/or treatment.

102.    At all times material hereto, Defendants knew and recklessly disregarded the fact that their pelvic mesh products cause debilitating and potentially lethal side effects with greater frequency than safer alternative products and/or methods of treatment and recklessly failed to advise the FDA of same.

103.    At all times material hereto, Defendants intentionally misstated and misrepresented data and continue to misrepresent data so as to minimize the risk of injuries caused by their pelvic mesh products.

104.    Notwithstanding the foregoing, Defendants continued to aggressively market their pelvic mesh products to consumers, without disclosing the true risk of side effects where there were safer alternatives.

105.    Defendants knew of their pelvic mesh products defective and unreasonably dangerous nature, but continued to manufacture, produce, assemble, market, distribute, and sell the pelvic mesh products so as to maximize sales and profits at the expense of the health and safety of the Public, including Plaintiff, in conscious and/or negligent disregard of the foreseeable harm caused by its pelvic mesh products.

106.    Defendants continued to intentionally conceal and/or recklessly and/or grossly negligently fail to disclose to the public, including Plaintiff, the serious side effects of their pelvic mesh products in order to ensure continued and increased sales.

107.    Defendants' intentionally reckless and/or grossly negligent failure to disclose information deprived Plaintiff of necessary information to enable her to weigh the true risks of using Defendants' pelvic mesh products against their benefits.

108.    As a direct and proximate result of the foregoing acts and omissions, Plaintiff has required and will require health care and services, and has incurred medical, health care, incidental, and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will in the future be required to obtain further medical care and/or hospital care and medical services.

109.    Defendants have engaged in conduct entitling Plaintiff to an award of punitive damages in that Defendants' actions, when viewed objectively from Defendants' standpoint at the time of the occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and Defendants had an actual, subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.

110.    WHEREFORE, Plaintiff demands judgment against Defendants, and requests compensatory damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT VIII

### Discovery Rule and Fraudulent Concealment

111.    Plaintiff realleges and incorporates by reference every allegation of this Complaint as if each were set forth fully and completely herein.

112.    Plaintiff pleads that the discovery rule should be applied to toll the running of the statute of limitations until Plaintiff knew, or through the exercise of reasonable care and diligence should have known, of facts indicating that Plaintiff had been injured, the cause of the injury, and the tortuous nature of the wrongdoing that caused the injury.

113.    Despite diligent investigation by Plaintiff into the cause of her injuries, including consultations with Plaintiff's medical providers, the nature of Plaintiff's injuries and damages and

their relationship to the pelvic mesh products were not discovered, and through reasonable care and due diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiff's claims. Therefore, under appropriate application of the discovery rule, Plaintiff's suit was filed well within the applicable statutory limitations period.

114.    Defendants are estopped from asserting a statute of limitations defense because Defendants fraudulently concealed from Plaintiff the nature of Plaintiff's injuries and the connection between the injuries and Defendants' tortious conduct.

PRAYER FOR RELIEF

115.    WHEREFORE, Plaintiff demands judgment against Defendants, and requests compensatory damages, together with interest, cost of suit, attorneys' fees, and all such other relief as the Court deems just and proper as well as:

      a.   Compensatory damages to Plaintiff for past, present, and future damages, including, but not limited to, pain and suffering for severe and permanent personal injuries sustained by Plaintiff, health and medical care costs, together with interest and costs as provided by law;

      b.   Reasonable attorneys' fees;

      c.   The costs of these proceedings;

      d.   All ascertainable economic damages;

      e.   Punitive damages; and

      f.   Such other and further relief as this Court deems just and proper.

PLAINTIFF DEMANDS A TRIAL BY JURY.

Dated: June 2, 2019                        Respectfully Submitted,

                                           *s/Mathew L. Coveney*
                                           Mathew L. Coveney
                                           Coveney Law, LLC

1075 Main Street, 4th Floor
Waltham, MA 02451
P: 781.478.7028
F: 781.250.2836
mcoveney@unitedlawteam.com

Breanne V. Cope (*Pro Hac Vice* forthcoming)
**COMMON SENSE COUNSEL LLP**
404 West 7th Street
Austin, TX 78701
Ph:      (310) 968-4701
Fax:     (512) 628-3390
breanne@commonsensecounsel.com

**ATTORNEYS FOR PLAINTIFFS**